IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHLEEN WHITE,                    )
                                   )
        Plaintiff,                 )    **Case No. 04 C 3307**
                                   )
        v.                         )    **Magistrate Judge Morton Denlow**
                                   )
AIRLINE PILOTS ASSOCIATION,        )
INTERNATIONAL and                  )
METROPOLITAN LIFE                  )                              /
INSURANCE COMPANY,                 )
                                   )
        Defendants.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathleen White ("Plaintiff" or "White") seeks judicial review of a final

decision denying her Long Term Disability ("LTD") benefits pursuant to the terms of an

Employee Welfare Plan ("the Plan") sponsored by her former employer, defendant Airline

Pilots Association International ("ALPA"). The Plan was insured by the defendant

Metropolitan Life Insurance Company ("MetLife"). The issue before this Court is whether

MetLife was arbitrary and capricious in denying White's claims for LTD benefits.

This case comes before the Court by means of a trial on the papers in which the parties

have submitted briefs and supporting exhibits which constitute the record in this case. *See*

*Sullivan v. Bornemann,* 384 F.3d 372, 375 (7th Cir. 2004) (noting that a district court

decision, rendered after reviewing the stipulated facts of the parties, was more akin to a

bench trial than summary judgment, and was thus governed by Federal Rule of Civil

Procedure 52(a)); *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (entering a judgment based upon a stipulation of facts that made up an administrative record was treated as a bench trial governed by Fed. R. Civ. P. 52(a)); *La Barge v. Life Ins. Co. of N. Am.*, 2001 WL 109527, *1 (N.D.Ill. Feb. 6, 2001) (conducting a trial on the papers in an ERISA case); Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, Fed. Lawyer, Aug. 1999, at 30. The parties agreed to proceed in this manner and to waive their right to present oral testimony. Oral argument was held on March 28, 2005.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed to be conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall be considered findings of fact.

## I. FINDINGS OF FACT

### A. THE PLAINTIFF: KATHLEEN WHITE

White was employed by ALPA for fifteen years, from January, 1987 to May, 2002. R. 74. Her position with ALPA was "Senior Communications Specialist," R. 26, where she provided support and counsel to ALPA's Director of Communication and to the Master Executive Counsel for the United Air Lines Pilots regarding member relations, media

relations, public relations, editorial services, and video production. White Aff. ¶ 7, Exh. A.[1]

White has two Bachelor of Arts Degrees, one in Journalism and Marketing from Lewis University and a second in Labor Studies from Antioch College, as well as a Master's Degree in Business Administration, also from Lewis University. White Aff. ¶ 3.

## B. PROCEDURAL HISTORY

As an insurance benefit of her employment, White was insured under a long term disability insurance policy underwritten by MetLife. R. 47-73. On May 17, 2002, White stopped working at ALPA. R. 28. White claimed that she was disabled and unable to return to work as a result of physical pain and mental depression resulting from a thoracotomy[2] on her right lung, an incurable blood disease called porphyria cutanae tardia ("PCT"),[3] mitral

---

[1] On December 16, 2004, the Court granted White's oral motion to file an Affidavit of Kathleen White in order to supplement the record with information regarding her job description. This affidavit was attached to White's Initial Memorandum in Support of her Entitlement to Long Term Disability Benefits and is referred to herein as: "White Aff."

[2] A "thoracotomy" is "[a]n incision into the chest wall." Stedman's Medical Dictionary 1806 (26th ed. 1995).

[3] "PCT"is "familial or sporadic porphyria (excessive excretion of porphyrins) characterized by liver dysfunction and photosensitive cutaneous legions, with hyperpigmentation and scleroderma-like changes in the skin, and increased excretion of uroporphyrin." Stedman's Medical Dictionary 1410 (26th ed. 1995); R. 123.

valve prolapse,[4] and carotid arteriosclerosis.[5]

White filed her application with MetLife for LTD benefits on September 10, 2002 through ALPA's Benefits/HRIS Administrator, Matthew Szlapak. R. 25-45. MetLife denied her application on November 1, 2002. R. 210-12. White appealed the decision on November 22, 2002. R. 17-18. Included in her appeal was a letter dated November 8, 2002, prepared by her treating physician, Dr. Adam Milik, in which he opined that White was unable to return to work. R. 19-20. This appeal was denied on December 12, 2002. R. 214-17. Plaintiff sent MetLife more documents in support of her appeal on January 30, 2003, March 20, 2003, and on April 10, 2003. R. 119-22, 204, 224. MetLife again denied her claim. R. 213, 204.

White brought this lawsuit on May 10, 2004. This case is before the Court on a trial on the papers. The record before the Court consists of the MetLife administrative record compiled by MetLife in reviewing White's claim. R. 1-237[6]. On December 19, 2003, the Social Security Administration approved White's claim for disability insurance benefits, R.

---

[4] "Mitral valve prolapse" is "excessive retrograde movement of one or both mitral valve leaflets into the left atrium during left ventricular systole, often allowing mitral regurgitation; responsible for the click-murmur of Barlow syndrome." Stedman's Medical Dictionary 1436 (26th ed. 1995).

[5] "Carotid arteriosclerosis" is the hardening of the carotid arteries. Stedman's Medical Dictionary 135 (26th ed. 1995).

[6] The original MetLife record consisted only of pages 1-217. MetLife attached pages 218 through 237 to its response brief. The Court considers these additional pages for the purpose of this trial on the papers.

193-95, commencing in January, 2004. R. **195.**

## C.    THE METLIFE DISABILITY PLAN

The MetLife Disability Policy ("the Plan") provides long term disability benefits to otherwise eligible Plan participants deemed "totally disabled". R. 68. The Plan covers "all active full time senior managers and directors." R. 72. It provides that a participant must first be continuously disabled for a 90 day "Elimination Period" before he or she may become eligible for benefits. R. 68. The Plan defines "disability" as:

> "Disable" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

> 1.    during your Elimination Period and the next 36 month period, you are unable to earn more that 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

> 2.    after the 36 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy and any gainful occupation taking into account your training, experience and Predisability Earnings.

R. 68.

MetLife reviewed Plaintiff's claim during the "Own Occupation" phase. The Plan defines "Own Occupation" as:

> "Own Occupation" means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position that you held with your Employer. It may be a similar activity that could be performed with your Employer or with any other Employer.

R. 67.

5

The Plan also provides the following definition of the term "Local Economy":

> "Local Economy" means the geographic area surrounding your place of residence which offers reasonable employment opportunities. It is an area within which it would not be unreasonable for you to travel to secure employment. If you move from the place you resided on the date you became Disabled, we may look at both the former place of residence and your current place of residence to determine the local economy.

*Id.*

The Plan vests MetLife, as Plan fiduciary, with discretionary authority to make determinations of eligibility for LTD benefits. Specifically:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

R. 50.

## D.   WHITE'S MEDICAL CONDITION AND TREATMENT RECORDS

### 1.   Dr. Adam W. Milik - Primary Treating Physician Before Surgery

On May 15, 2002, White began experiencing a severe pain in her right side. R. 120, 123. After the pain did not subside within a few days, White consulted her primary care physician, Dr. Adam Milik. R. 120, 123. Dr. Milik thought that White may be suffering from a gallbladder problem, but testing of her liver, gallbladder, and pancreas revealed nothing. R. 123, 39.

## 2. Dr. Raju Z. Abraham - Emergency Room Doctor

On May 24, 2002, when the pain persisted, White presented herself to the emergency room at Riverside Medical Center where she was seen by Dr. Raju Abraham. R. 123. Dr. Abraham prepared a "History of Present Illness" which noted that an x-ray had revealed an increasing right effusion[7] and infiltration in her chest. R. 123-26. Dr. Abraham noted that White had increased pain in her right lower chest, shortness of breath, and shallow respirations. R. 123. Dr. Abraham also noted that White had a history of medical problems including PCT, mitral valve prolapse, and carotid arteriosclerosis. R. 123-25.

## 3. Dr. Paul E. Rowland - Surgeon

White was eventually diagnosed with "right lower lobe pneumonia with multiloculated pleural effusions and entrapped right lower and middle lobes of the lung." R. 129. On May 29, 2002, White underwent a thoracotomy[8] on her right lung which was performed by Dr. Paul Rowland. R. 127-32. Following the surgery, White remained under the care of Dr. Roland until July 16, 2002. R. 21. On July 16, 2002, Dr. Rowland wrote to Dr. Milik, updating him on the condition of his patient and noting that White's "wounds have healed normally and she is doing well. The chest wall discomfort is improving fairly rapidly." R. 21.

---

[7] "Effusion" is "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity." Stedman's Medical Dictionary 547 (26th ed. 1995).

[8] See supra, note 2.

7

### 4. Dr. Adam W. Milik - Primary Treating Physician After Surgery

On August 5, 2002, White returned to Dr. Milik complaining of "atypical" right sided chest pains and shortness of breath. R. 23. Dr. Milik noted that the pains were on and off, sometimes lasting the entire day. *Id.* Dr. Milik noted that White was very emotional and cried easily. White's EKG was normal; there were no signs of ischemia, and she had a normal sinus rhythm. *Id.* Dr. Milik reported that White "does not really want to go back to her previous job." *Id.* He diagnosed her with major depression, gave her a prescription for Paxil and pain medication, and ordered a chest x-ray to rule out pleural effusion. *Id.*

Dr. Milik saw White again on August 27, 2002. R. 22. Although she denied chills, fever, nausea or vomiting, Dr. Milik observed that there was no difference in White's right chest wall pain and she still experienced occasional shortness of breath. *Id.* The chest area pain was somewhat improved with physical therapy, but there had been no response to the pain medication, so he stopped her prescription. Instead, Dr. Milik prescribed Mobic and Neurontin because he suspected a "neuropathic component" to her pain. *Id.* As far as White's mental stability, Dr. Milik noted that her depression seemed to be improving with the Paxil, so he continued her prescription. He also thought that White's continued shortness of breath was "secondary very likely to major depression." *Id.*

Dr. Milik saw White again on September 9, 2002. R. 24. His notes reflect that White still suffered from right sided chest pain and that it was "getting worse." *Id.* He also noted that she continued to have shortness of breath. Dr. Milik gave White a referral to a pain

8

clinic. Her major depression was "very well controlled" and Dr. Milik concluded that White should continue taking the Paxil. R. 24. Dr. Milik's opinions regarding White's ability to return to work are discussed *infra*, in connection with MetLife's processing of White's claim. *See* Parts I.E.1-3.

### 5.    *Dr. Robert A. Menotti - Independent Physician Consultant*

During the review process, MetLife forwarded Plaintiff's medical records to Dr. Robert A. Menotti, an independent physician consultant ("IPC"), for a "Physician Consultant Review". R. 208-09. Dr. Menotti gave his opinion of Plaintiff's ability to return to work by summarizing what he found to be important in Drs. Rowland's and Dr. Milik's records. R. 208. First, Dr. Menotti noted that Dr. Rowland's records indicated that Plaintiff was healing normally after her surgery and that her chest discomfort was improving fairly rapidly. *Id.* Next, Dr. Menotti discussed Dr. Milik's conclusions that Plaintiff had not yet returned to her presurgical condition, citing shortness of breath and major depression. *Id.* Dr. Menotti noted that Dr. Milik's records indicated that Plaintiff also suffered from a skin condition, had some narrowing of her left internal carotid artery, and suffered from mitral valve prolapse. *Id.*

Dr. Menotti summarized, "the claimant had an acute episode of pneumonia that was complicated by pleural effusion and later entrapment of the right lung...[but] there were no complications of a serious nature one normally sees as a result of this...." *Id.* Dr. Menotti concluded:

> There is simply not enough medical documentation from Dr. Milik to lead this reviewer to believe at this point in time that the claimant is not medically able

9

to return to the essential duties of her ***own occupation*** following her acute lung surgery. I would expect there to be more medical to flow into this chart regarding the management of the other chronic conditions. However, the documentation at this point in time relating to these chronic conditions does not appear to be enough to preclude her from performing the essential duties of her ***own occupation*** at this point in time.

R. 209 (emphasis added).

### 6.     *Toni Blumenthal - White's Therapist*

On March 5, 2003, White met with a therapist at Riverside Behavioral Services, Toni Blumenthal. R. 229-237. Blumenthal's report indicates that White had a functional impairment associated with her symptoms of depression, in the areas of "self care and maintenance" and "role functions in job or home/daily living skills." R. 230. Blumenthal indicated that he did not believe White could work as it was difficult to do any daily jobs. *Id.* He noted that White appeared "very hyper, almost hypermanic," and that her speech was rapid. R. 235.

### 7.     *Dr. Reginald A. Givens - Independent Physician Consultant of Psychiatry*

In April 25, 2003, MetLife sent White's file to another IPC, Dr. Reginald A. Givens, a Board Certified psychiatrist. R. 206. Dr. Givens did not examine White nor is there any indication that he spoke to White's treaters. The record is unclear as to what MetLife sent to Dr. Givens, but on May, 6, 2003, Dr. Givens sent MetLife a recommendation letter, at the top of which he listed White's job as "customer service assistant." R. 218-20. Dr. Givens diagnosed White with depression, and noted that the "general progression of symptoms has been toward improvement." R. 218. He stated, "Ms. White's level of functionality based

10

upon objective evidence in the medical records are that she maintains the ability to understand and memorize, also to sustain concentration persistence, to engage in social interactions either occupationally or in the general public." R. 219. "[U]nder the assumption that the records presented for review and consideration are true and correct," Dr. Givens concluded, "the medical records demonstrate that there are no psychiatric functional limitations that would have precluded her from performing all of her occupation from 05/17/02 to the present." *Id.*

## E. METLIFE'S LONG TERN DISABILITY BENEFITS DETERMINATION

### 1. *White's Disability Application*

White's 90-day Elimination Period, during which she was required to be continuously disabled as defined under the terms of the Plan in order to become eligible for benefits, ended on August 15, 2002. R. 68, 215. White filed her application for ALPA's LTD benefits on September 10, 2002 through ALPA's Benefits/HRIS Administrator, Matthew Szlapak. R. 25-45. The application was a MetLife LTD Disability Claim form in three parts: an Employee Statement, R. 26-27, an Employer Statement, R. 28-29, and the Attending Physician Statement, R. 30-31.

In the first part of the application, the Employee Statement, White identified Dr. Milik as her primary care physician and Drs. Milik, Gombiner, and Rowland as physicians she had seen in the previous two years. R. 26. She stated that Dr. Milik had been treating her for mitral valve prolapse since January 2001, that Dr. Gombiner had been treating her for PCT

11

since November 2000, and that Dr. Rowland had been her surgeon for the thoracotomy in May 2002. R. 26. She also signed an authorization for the release of her medical records. R. 27. In response to the question "[p]lease describe what prevents you from preforming the duties of your job", White responded, "physically and mentally unable. See Dr.'s notes." R. 26.

In the second part of the application, the Employer Statement, Mr. Matthew Szalpak, ALPA's Benefits Manager, identified White's job as "Communications Specialist." R. 28. On the pre-printed form, Szalpak identified the physical and mental requirements of a Communications Specialist by checking boxes. R. 29. For instance, Szalpak estimated that White was required to sit for 5-6 hours a day while she only stood for 1-2 hours every day. *Id.* In response to MetLife's inquiry as to the "frequency of interpersonal relationships necessary to perform the job", Szalpak placed White's job at the higher end of the "continuously" category. R. 29, Item No. 18. Also, in quantifying the "frequency of stressful situations necessary to perform the job", Szalpak placed White's job between "frequently" and "continuously." R. 29, Item No. 19.

Although the form required that ALPA "must also attach a copy of your company's job description for the employee," no such description was attached to White's application, and no such job description was contained anywhere in the file.[9] R. 29.

---

[9] Defendant and Plaintiff agreed during oral argument on March 28, 2005 that the file does not contain a job description as required by MetLife's disability application.

In the third part of the application, the Attending Physician Statement, Dr. Milik stated

that White's primary diagnosis and treatment was "pneumonia with effusion", her secondary

diagnosis and treatment was PCT, and her symptoms were chest pains and shortness of

breath. R. 29-30. Dr. Milik also listed the medications that White was taking, including

Paxil. R. 30. Dr. Milik checked the box on the MetLife form to indicate that White was

"unable to engage in stressful situations or engage in a personal relationship (marked

limitations)." R. 30. Dr. Milik also attached a number of laboratory and other reports

relating to White's medical condition in May of 2002 and the surgery performed on her at

that time. R. 32-45.

## 2. *MetLife's Initial Denial of White's Disability Claim.*

On September 18, 2002, White's claim was assigned to a MetLife employee,

identified only as "N 235" for review. R. 3. On October 1, 2002, a nurse consultant ("NC")

did a "walk-up" with the case management specialist regarding White's claim. R.3. The

record indicates only that the NC reviewed the lab reports and Dr. Milik's Attending

Physician statement. At that time, the NC was "not sure" what the diagnosis was. R. 4. The

record also indicates that the NC asked Dr. Milik's office to send White's medical records,

and Dr. Milik's medical notes were included in the record a short time thereafter. R. 4

On October 16, 2002, the NC issued an internal "initial review recommendation"

regarding White's case. R. 4. First, the NC incorrectly identified White's job at ALPA as

a "customer service assistant" and then concluded that this position "most likely [fell within]

13

the lt [light] work category." *Id.* The NC briefly summarized White's medical troubles and then concluded that "the medicals do not support restrictions and limitations which would preclude [White] from her light work." *Id.* That same day, N 235 entered a "denial summary" into MetLife's file. R. 5. In the denial summary, N 235 correctly identified White's job as a "Communications Specialist," gave a brief synopsis of her major symptoms, and concluded by recommending a denial because the "medical records do not support" a disability. *Id.*

By letter dated November 1, 2002, MetLife notified White that it had denied her claim for LTD benefits. R. 210-12. The letter correctly stated White's job title and then stated simply that the records provided by Dr. Milik "do not support impairments that would prevent you from returning to your light level position." R. 211. The letter gives a brief summary of White's medical conditions, but did not mention her diagnosis of major depression, her prescriptions for any drugs besides the first pain medication prescribed by Dr. Milik, the recommendation that White attend a pain management program, or Dr. Milik's conclusion that White's job had "marked limitations" in her ability to engage in stressful situations or interpersonal relationships. R. 28-31.

### 3. *MetLife's Denial of White's First Appeal*

On November 22, 2002, ALPA's Benefits/HRIS Administrator, Matthew Szlapak, faxed to MetLife White's appeal from the denial of her disability claim. R. 17-24. Included in White's appeal was a letter dated November 8, 2002 prepared by Dr. Milik. R. 19-20. Dr.

14

Milik explained that he was writing at White's request to provide a "concise, specific narrative written report as to her current medical condition, how it happened and why based on this condition she can no longer work." R. 19. In the letter, Dr. Milik opined that: 1) White continued to complain of upper right flank pain despite multiple changes to medications and recently completed physical therapy; 2) he had recommended that White see a chronic pain specialist; 3) White continued to experience shortness of breath and had developed major depression; 4) White also suffered from other chronic conditions such as PCT, narrowing of the carotid artery, and mitral valve prolapse; and 5) he had learned from White that her job involved a lot of stress and required a lot of travel, meetings, and carrying heavy objects such as a computer, cameras, and briefcases. *Id.* Dr. Milik stated, "obviously with her current medical condition and continuing pain as well as major depression, she would not be able to continue at her previous position." *Id.* He concluded that White's condition was "chronic" and would require a prolonged period of time to improve. *Id.* He closed by stating, "from what the patient is telling me about her position, it appears that she would not be able to return to her work at the present time." R. 20.

MetLife received White's appeal on November 21, 2002. R. 16. The record contains a copy of an "Appeal Referral Form", R. 11-12, which indicates that a nurse had initially reviewed White's claim and that MetLife's records still did not contain a job description. R. 11.

On December 9, 2002, MetLife sent White's file to an IPC, Dr. Robert A. Menotti.

15

On MetLife's IPC referral form, MetLife incorrectly stated twice that White's job title was "Customer Service Assistant". R. 14-15. MetLife characterized White's primary diagnosis as "shortness of breath". R. 14. The form also directed Dr. Menotti not to call White's attending physician, Dr. Milik. *Id.*

By letter that same day, Dr. Menotti recommended that MetLife deny White's claim for disability. R. 208-09. This letter, discussed *supra*,[10] does not address the fact that White continued to experience pain in her side after the surgery, nor does it mention that White had been referred to a chronic pain clinic; the letter also does not address the nature (or even identify the title) of White's job. *Id.* Dr. Menotti's letter merely concluded that "at this point in time" there was nothing to indicate that White was not medically able to return to "the essential duties of her own occupation." R. 209. Dr. Menotti did not examine White and he did not contact Dr. Milik.

Three days later, on December 12, 2002, MetLife notified White that her appeal from the denial of LTD had been rejected. R. 214-17. The letter correctly referred to White's job title as "communications specialist" and then stated, "we received no documentation or medical rational to support your inability to perform your own occupation." R. 216. The MetLife letter also stated that during the review of White's appeal, White's file had been reviewed by an IPC who concluded that "there is not enough medical documentation from Dr. Malik(sic) to support that you are medically unable to return to your own occupation."

---

[10] *See* Part I.D.4.

*Id.* MetLife informed White that she had exhausted her administrative remedies under the Plan and that no further appeals would be considered. R. 217.

### 4.    *MetLife's Rejection of White's "Second" Appeal*

On January 30, 2003, ALPA's Matt Szalpak again provided to MetLife "new materials for consideration as regards White's LTD claim." R. 119-45. Included in the documents were: 1) a narrative of White's medical condition from May 15, 2002, forward, R. 120-22; 2) Riverside Medical Center records relating to White's thoracotomy, R. 123-32; 3) reports prepared by a chronic pain consultant, Dr. Sundershand Saxena, of the Center for Pain Treatment, R. 133-37; 4) pre-May 2002 medical and diagnostic reports relating to White's mitral valve prolapse heart condition, R. 138-142; 5) a copy of Dr. Milik's November 8, 2002 letter, R. 143-44; 6) photographs of White's hands showing manifestations of PCT, R. 145; 7) a summary description of PTC, R. 90; 8) correspondence between White's dermatologist, Dr. Gombiner, and Dr. Milik regarding the treatment of PCT, R. 91-92; 9) a report to Dr. Gombiner from Dr. Jean Baptiste and Dr. Brieva of the Northwestern Medical School Department of Dermatology dated December 17, 2001, relating to White's PTC, R. 93; and 10) an ambulance report and treatment notes relating to a syncopal episode experienced by White in 2001, R. 94.

These additional records were not forwarded to Dr. Menotti. They were reviewed by a MetLife nurse. On February 11, 2003, an employee at MetLife sent Matt Szalpak an e-mail that stated:

17

> The nurse has completed a review of the file. There is no new medical except for the photographs, which would overturn the initial decision to deny the claim or the initial decision to deny the claim or the Appeal Unit's decision to uphold denial.

R. 118. White was also sent a letter from MetLife notifying her of MetLife's decision. The letter, dated March 4, 2003, stated that the documents sent by Szalpak on January 30, 2003, "do not support the restrictions of disability." R. 213. Again, MetLife stated that the denial constituted MetLife's final determination. *Id.*

### 5. *MetLife's Denial of White's Third Appeal*

Sometime in late March or early April, ALPA sent to MetLife a re-application for LTD benefits on behalf of White. R. 224-25. The record only includes a portion of this re-application, including a letter from Matthew Szalpak dated March 20, 2003, R. 224, and an employee statement signed by White on March 19, 2003. R. 225. On May 8, 2003, ALPA and White both received letters from MetLife informing them that a separate LTD claim filed on White's behalf on or about April 10, 2003 had been rejected. R. 203, 204-07. Unfortunately, the record of MetLife's consideration of White's LTD claim contained no other documents relating to the April 2003 LTD claim until MetLife attached them as an appendix to its response brief. R. 218-37. The new portion of the record shows that during May, 2003, MetLife received additional records from a pain specialist as well as a mental health specialist, Toni Blumenthal.

MetLife claims to have sent White's new documentation to another IPC, Dr. Reginald A. Givens, a Board Certified psychiatrist. R. 206, 218-20. Dr. Givens sent MetLife a letter

18

on May 6, 2003, in which he concludes, "from a psychiatric perspective, the medical records demonstrate that there are no psychiatric functional limitations that would have precluded her from performing all of her occupation from 5/17/02 to the present." R. 219.

### 6. Records Relating to Another MetLife Claimant

Disturbingly, the record also contains numerous documents relating to another claimant. R. 147-71. MetLife offered no explanation for these apparently stray documents.

### 7. MetLife Fails to Respond to Social Security's Finding of Disability

In December of 2003, the Social Security Administration made a determination that White was totally disabled and entitled to disability payments. R. 193-95. In January 2004, White's attorney notified MetLife that White had qualified for Social Security Disability Insurance, and requested that her claims to LTD benefits under the Plan be reviewed. R. 191-92. The record does not contain any response from MetLife.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION

This suit comes before this Court pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Jurisdiction lies in this Court pursuant to 29 U.S.C. § 1132(a)(1)(B). *Exbom v. Cent. States, Southeast & Southwest Areas Health & Welfare Fund*, 900 F.2d 1138, 1140-41 (7th Cir. 1990). Venue is properly placed in the Northern District of Illinois pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

19

## B.   LEGAL STANDARDS

Congress enacted ERISA " 'to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.' " *The Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). "ERISA and the Secretary of Labor's regulations under the Act require a 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denial." *Id.* at 1967; *see also* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1.

### 1.    Standard of Review is "Arbitrary and Capricious"

Under ERISA, the judicial standard of review for benefit determinations hinges on whether the plan administrator or fiduciary has been granted discretion in making the benefit determination. *Firestone*, 489 U.S. at 115; *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2005). As a default, courts review benefit determinations under ERISA through the application of a *de novo* standard. *Firestone*, 489 U.S. at 115; *Ruiz*, 400 F.3d at 989. However, if the administrator or fiduciary is given discretionary authority to determine eligibility for benefits, the decision will be reviewed under the deferential arbitrary and capricious standard. *Ruiz*, 400 F.3d at 989. Under the arbitrary and capricious standard, a fiduciary's decision to deny a claimant benefits is entitled to great deference. *Id.* at 991. The fiduciary's decision will not be overturned unless the decision is "downright unreasonable." *Id.; see also Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000) (stating that

determinations will be overturned by the court only when they are "unreasonable, and not [when] merely incorrect."); *Trombetta v. Cragin Federal Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir.1996) (finding that the administrator's decision is arbitrary or capricious "only when the decisionmaker has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence..,or is so implausible that it could not be ascribed to a difference in view or the product of...expertise.") (internal quotations omitted).

Relevant factors to be considered include "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995). A plan administrator's decision will be upheld where it makes an informed judgment and articulates an explanation "that is satisfactory in light of the relevant facts, *i.e.*, one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached." *Exbom*, 900 F.2d at 1143. However, "[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003). Even under the deferential standard of arbitrary and capricious, courts will not uphold an insurer's decision to deny benefits "when there is an

21

absence of reasoning in the record to support it." *Hackett,* 315 F.3d 771 at 774-75.

The disability insurance policy at issue grants MetLife "discretionary authority" to determine eligibility for LTD benefits and to interpret the Plan's terms and conditions. R. 50. As a result, the Court will review MetLife's denial of White's benefits under the arbitrary and capricious standard. *See Houston v. Provident Life and Accident Ins. Co.,* 390 F.3d 990, 995 (7th Cir. 2004) ("When a plan confers such discretion upon the plan administrator or fiduciary, we shall not disturb a decision concerning eligibility for benefits unless it is arbitrary and capricious.").

### 2. *ERISA Statutory Requirements Require a Full and Fair Review*

Because MetLife is both claims administrator and insurer, MetLife has an inherent conflict of interest. *Hightshue v. AIG Life Ins. Co.,* 135 F.3d 1144, 1148 (7th Cir. 1998) (citing *Donato v. Metro Life Ins. Co.,* 19 F.3d 375, 379 n.3 (7th Cir. 1994)); *see Firestone,* 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.") (internal quotations omitted). When the claim administrator has such a conflict of interest, "though the standard of review is nominally the same, the judicial inquiry is more searching."*Ladd v. ITT Corp.,* 148 F.3d 753, 754 (7th Cir.1998).[11]

_____

[11] *But see Mers v. Marriott Int'l Group Accidental Death & Dismemberment,* 144 F.3d 1014, 1020 (7th Cir. 1998) ("[W]e have rejected the theory that an inherent relational conflict is sufficient to alter the standard of review by applying a law-and-

ERISA requires that an insurance company follow certain minimum standards for procedures and notification when the insurance company denies an application for LTD benefits. *See* 29 U.S.C. § 1133. In general, ERISA and the Secretary of Labor's regulations under the Act requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Nord,* 538 U.S. at 825; *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 688 (7th Cir. 1992); *see also Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 919 (7th Cir. 2003) (finding for the claimant despite the deference of the "arbitrary and capricious" standard because there were mere "scraps" of evidence offsetting the conclusion that claimant was disabled); *Crespo v. Unum Life Ins. Co. of Am.,* 294 F.Supp.2d 980, 994 (N.D. Ill. 2003) (finding that the insurance company's denial of claimant's claim was arbitrary and capricious because the review was neither full nor fair).

The core requirements of a full and fair review include "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan,* 797 F.2d 521, 534 (7th Cir.1986); *see also Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 157 (4th Cir. 1993) ("[A] full and fair review must

---

economics rationale to establish that no conflict exists."). For a lengthy discussion as to the extent an insurer's conflict of interest should be considered, see *Perlman v. Swiss Bank Corp. Comprehensive Plan,* 195 F.3d 975, 980-82 (7th Cir. 1999).

be construed not only to allow a pension plan's trustees to operate claims procedures without

the formality or limitations of adversarial proceedings but also to protect a plan participant

from arbitrary or unprincipled decision-making.").

The particular provision of ERISA sets out the following duties for plan

administrators:

> (1) provide adequate notice in writing to any participant or beneficiary whose
> claim for benefits under the plan has been denied, setting forth the specific
> reasons for such denial, written in a manner calculated to be understood by the
> participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits
> has been denied for a *full and fair review* by the appropriate named fiduciary
> of the decision denying the claim.

29 U.S.C. § 1133 (emphasis added); *see also Halpin*, 962 F.2d at 689. Further, several

regulations also provide the following in relation to the contents of the notice of claim denial:

> (1) The specific reason or reasons for the denial;
> (2) Specific reference to pertinent plan provisions on which the denial is based;
> (3) A description of any additional material or information necessary for the
> claimant to perfect the claim and an explanation of why such material or
> information is necessary; and
> (4) Appropriate information as to the steps to be taken if the participant or
> beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f).

These requirements ensure that when a claimant appeals a denial to the plan

administrator, he will be able to address the determinative issues and have a fair chance to

present his case." *Halpin*, 962 F.2d at 689; *see also Gallo v. Amoco Corp*, 102 F.3d 922,

922-23 (7th Cir. 1996). "In determining whether a plan complies with the applicable

regulations, substantial compliance is sufficient." *Halpin*, 962 F.2d at 690. "Every procedural defect will not upset a trustee's decision." *Id. (quoting Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 393 (7th Cir.1983)). "The application of these standards to a particular disability situation is necessarily a fact-intensive inquiry." *Halpin*, 962 F.2d at 690.

## C. METLIFE'S DECISION TO DENY LTD BENEFITS TO WHITE WAS ARBITRARY AND CAPRICIOUS

Under ERISA, the insurer must make a full and fair assessment of the claims and if it denies disability, it must clearly communicate to the claimant the specific reasons for the benefit denials. 29 U.S.C. § 1333. MetLife did not conduct a full and fair review and therefore its decision to deny White LTD benefits was arbitrary and capricious. *See e.g. Hawkins*, 326 F.3d at 919 (holding that the insurer's discretion to review a claim is not unlimited and indeed cannot be upheld if "the record contains nothing more than scraps to offset the evidence" presented by the claimant and her doctor); *Quinn v. Blue Cross & Blue Shield Assn.*, 161 F.3d 472, 476-77 (7th Cir. 1998) (finding that an insurer's review was arbitrary and capricious when the insurance company failed to adequately investigate the requirements of the claimant's previous occupation).

### 1. Failure to Accurately Name or Describe White's "Own Occupation"

The first reason that MetLife did not make a full and fair review of White's claim is that MetLife failed to accurately name or describe White's own occupation. Throughout the application and appeals process, MetLife continually denied White benefits because White's medical records did not support her inability to perform her "own occupation". R. 211, 209,

25

216, 219. However, MetLife never received a description from ALPA of White's "own occupation,"even though MetLife's own policy required that such a job description be included in the file. *See* R. 29 (MetLife's LTD Disability Claim Form mandates that the employer, ALPA, provide a written job description of the employee's position). This Court is unclear how MetLife's reviewing nurse and the two IPC's (Dr. Menotti and Dr. Givens) could possibly find that White was medically able to perform the duties of her "own occupation" when there was no job description in the file to indicate what her "own occupation" actually entailed.

Even more disturbing, on three separate occasions, MetLife actually misstated White's job title, calling her a "customer service assistant" rather than a Senior Communications Specialist. R. 4, 14-15. Indeed, these misstatements came at critical times in the applications process. In White's initial application for LTD benefits, the unnamed nurse consultant who reviewed her file and concluded that she did not qualify for benefits stated that White was a "customer service assistant" and then made some broad, unfounded assumptions about the difficulty of a customer service assistant job. R. 4. The second time that MetLife incorrectly stated White's job title was also at a critical time in the reviewing process. In the second instance, MetLife misstated White's job title, stating that she was a "customer service assistant," on the MetLife Disability IPC Referral Form that MetLife sent to Dr. Menotti. R. 14-15. This is critical because Dr. Menotti twice refers to White's ability to perform her "own occupation." R. 209. This Court cannot be certain whether Dr. Menotti thought that

26

White's "own occupation" was "customer service assistant" or "Senior Communications Specialist", but it is obvious that there was no job description of either position within the file. Even if Dr. Menotti had discovered that there was a discrepancy and had somehow correctly concluded that White's job title was Senior Communications Specialist, he had no information about what a Senior Communications Specialist at ALPA was required to do. Dr. Menotti had no contact with White, her employer, or her doctors. How he then concluded that White was medically able to perform her "own occupation" remains a mystery.

The third time that the record reflects an erroneous reference to "customer service assistant" is in Dr. Given's recommendation letter to MetLife. R. 218-220. At the very top of Dr. Given's letter, he noted that White was a "customer service assistant." As an independent physician consultant, Dr. Givens was tasked with determining whether White was disabled according to MetLife's own definition. Indeed, in his letter, Dr. Givens specifically stated the question posed to him by MetLife: "Do the medical records provided demonstrated(sic) psychiatric functional limitations that would have precluded Ms. White from performing her own occupation from 05/17/02-present?". R. 219. Dr. Givens concluded that they did not. *Id.* Again, it is inconceivable to this Court that based upon his erroneous belief that White was a customer service assistant, Dr. Givens' determination that White was able to do her "own occupation", was either full or fair. Dr. Givens himself provided a caveat to his opinion: he stated that his independent review was rendered "under

the assumption that the records presented for review and consideration are true and correct." *Id.* The records given to Dr. Givens were obviously not true and correct.

Other courts in this Circuit have found that a review process where the insurance company fails to determine what an applicant's job duties entailed was not full nor fair. *See e.g., Quinn v. Blue Cross & Blue Shield Assn.*, 161 F.3d 472, 476-77 (7th Cir. 1998) (discussed *infra*); *Hillock v. Cont'l Cas. Co.*, 2004 WL 434217, *5 (N.D. Ill. March 2, 2004) (finding that the insurer's assumption that the claimant had the ability to choose when she sat or stood based upon a job description was arbitrary and capricious). For example, in *Quinn v. Blue Cross and Blue Shield Association*, the Seventh Circuit affirmed a lower court's determination that an insurance company's review was arbitrary and capricious when the insurance company failed to investigate the requirements of the claimant's previous occupation. *Quinn*, 161 F.3d at 476. In *Quinn*, the claimant was a payroll assistant who applied to Blue Cross and Blue Shield Association ("Blue Cross") for LTD benefits. *Id.* In order to determine whether the claimant was eligible for LTD benefits, Blue Cross procedures required it to determine whether the claimant was capable of performing another job with a salary level similar to that of her current job. *Id.* Blue Cross decided that the claimant was able to perform another job, but admitted that during the review process it did not know what the claimant's job duties entailed, what her exertional requirements were, any training and experience she possessed, or any transferable skills she may have obtained. *Id.* The court found that the Blue Cross reviewer "simply based her opinion on her own notion

of what a payroll accounts assistant does." This was not enough. The court explained:

> We agree that [the reviewer] was under no obligation to undergo a full-blown vocational evaluation of Quinn's job, but she was under a duty to make a reasonable inquiry into the types of skills Quinn possesses and whether those skills may be used at another job that can pay her the same salary range as her job with [her former employer]....By not even performing the slightest inquiry into this matter, [the reviewer] made her decision arbitrarily and capriciously.

*Id.*

MetLife sets its own procedures for determining whether a claimant is eligible for LTD benefits. MetLife's fundamental inquiry is whether the applicant is competent to do work in his or her "own occupation." In order to determine this, MetLife requires the employer to attach the employee's job description with the application. In this case, MetLife did not follow its own procedures; it reached conclusions about White's ability to perform her "own occupation" without ever defining what her occupation was; and on three separate occasions, it actually misstated White's job title. A review process based upon such carelessness and inconsistency cannot be considered either full or fair. Therefore, MetLife's decision to deny benefits to White was arbitrary and capricious.

### 2. MetLife Unfairly Restricted the IPC's Independent Review and Failed to Supply Him With Further Medical Evidence

The other reason that MetLife did not make a full and fair review of White's claim is that MetLife restricted Dr. Menotti's ability to review White's claim and then failed to send him additional medical evidence that could have assisted him in his evaluation. After White's initial application was denied, MetLife referred White's claim to Dr. Menotti on

29

December 9, 2002. MetLife did not instruct the doctor to examine White and in fact it instructed Dr. Menotti not to call her treating physician, Dr. Milik. R.14. That same day, Dr. Menotti wrote back to MetLife concluding, "there is simply not enough medical documentation from Dr. Milik to lead this reviewer to believe at this point in time that the claimant is not medically able to return to the essential duties of her own occupation." R. 209. He continued, "I would expect there to be more medical to flow into this chart regarding the management of the other chronic conditions." *Id.* "However," the doctor concluded, "the documentation at this point in time relating to these chronic conditions does not appear to be enough to preclude her from performing the essential duties of her own occupation at this point in time." *Id.*

The doctor's language appears deliberately ambiguous and vague. Dr. Menotti based his conclusion on the fact that there was "not enough medical evidence" to support a finding of disability; the doctor certainly did not rule out the possibility that more evidence would support a finding that White was disabled. Yet because of MetLife's instructions, Dr. Menotti had no way of obtaining more medical evidence in order to reach a more conclusive recommendation. MetLife effectively tied Dr. Menotti's hands by giving him medical documents and then not allowing him to contact White or her reviewing doctor for further information.

Moreover, when White supplied MetLife with additional documents on January 30, 2003, MetLife never sent them to Dr. Menotti for further review, even though he previously

30

indicated that he expected more medical evidence to come into the file. Instead, MetLife gave these new documents to an unidentified MetLife nurse consultant, whose medical qualifications are uncertain, who concluded that the new documents contained no new pertinent evidence. MetLife failed to allow Dr. Menotti to conduct a truly "independent" review of White's claim, by instructing him not to talk with the treating physician and by failing to let him examine all of the medical evidence.

It is true that seeking independent expert advice is evidence of a thorough investigation. *Hightshire*, 135 F.3d at 1148 (finding that the insurer did not act arbitrarily and capriciously, partly because the insurer obtained independent expert advice); *see Anderson v. Operative Plasterers' & Cement Masons' Int'l Assoc. Local No. 12 Pension & Welfare Plans*, 991 F.2d 356, 358 (7th Cir. 1993) (upholding a plan administrator's decision to deny benefits when the plan administrator's decision was partially based upon an examination by an independent physician); *see also Nord*, 538 U.S. 822, 827 (concluding that the insurer's reliance upon the opinion of an independent neurologist who examined the claimant was reasonable, despite the fact that the claimant's treating physician reached a different result). However, in order for that expert advice to have any credible weight, the insurer must "investigate the expert's background, provide the expert with complete and accurate information, and determine that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* In this case, MetLife did not provide Dr. Menotti with all of the information, and based upon the limitations MetLife placed upon the doctor,

it could not have reasonably relied upon his advice.[12]

Under Seventh Circuit case law, a treating physician's information is likely superior

to the information of a plan's medical consultant, when the consultant has not examined the

claimant but has only spoken to the treating physician on the telephone. *Hawkins*, 326 F.3d

at 917.[13] In this case, Dr. Menotti did not even talk with Dr. Milik on the phone - he was

instructed not to do so by MetLife. *Compare Nord*, 538 U.S. 822, 827 (noting that the

independent consultant conducted an exam of the claimant); *Anderson*, 991 F.2d at 358

(noting that the independent consultant conducted an examination of the claimant).

MetLife's actions in relying so completely on Dr. Menotti's "independent recommendation"

were arbitrary and capricious.

**D.    REMAND IS UNNECESSARY**

This Court further finds that remand is unnecessary because on the record before

---

[12] As the Court noted *supra*, in Part II.C.1, MetLife clearly did not provide Dr.
Givens with accurate medical records or evidence either, as Dr. Givens listed White's job
as a customer service assistant.

[13] ERISA does not require plan administrators to accord special deference to the
opinions of treating physicians. *Nord*, 538 U.S. at 824 ("[C]ourts have no warrant to
require administrators automatically to accord special weight to the opinions of a
claimant's physician; nor may courts impose on administrators a discrete burden of
explanation when they credit reliable evidence that conflicts with a treating physician's
evaluation."). However, the Seventh Circuit in *Hawkins* recognized that an *examining*
physician's recommendation should be given more weight than a consultant who did not
examine the claimant. *Hawkins*, 326 F.3d 914, 917. Thus, this Court does not rely on the
"treating physician rule", forbidden in ERISA claims. The Court merely notes that Dr.
Menotti's recommendation was made without examining White and without speaking
with her treating physician, and without the complete medical files provided by White.

MetLife the case is so clear cut that it would be unreasonable for MetLife to deny the application for benefits on any ground and because MetLife's conduct was patently unreasonable in failing to provide a full and fair review. *Hess,* 274 F.3d at 464; *Gallo,* 102 F.3d at 923; *see also Pritcher v. Health Care Svc. Corp.,* 301 F.3d 811, 818 (7th Cir. 2002) (upholding a district court decision to award liability, not merely remand the case back to the insurer, when it was clear that the insurer's original decision was "patently unreasonable"); *Weaver,* 990 F.2d 154, 159 ("[A] remand for further action is unnecessary here because the evidence clearly shows that Phoenix Home Life abused its discretion.").

The Seventh Circuit has stated that if an insurer merely fails to make an adequate finding as to a claimant's disability, a court should not award retroactive benefits without remanding the case back to the insurer. *Quinn,* 161 F.3d at 477. However, such an award of retroactive benefits is proper "where there is no evidence in the record to support a termination or denial of benefits." *Id.* at 477; *DiPietro v. Prudential Ins. Co. of Am.,* 2004 WL 626818, *11 (N.D.Ill. 2004). To demonstrate when it might be proper for a court to award benefits without remand, the *Quinn* court cited several cases, including *Grossmuller v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW,* 715 F.2d 853, 858-59 (3d Cir. 1983), where the insurer's claims procedure did not provide the claimant with a full and fair review, and *Govindarajan v. FMC Corp.,* 932 F.2d 634, 637 (7th Cir. 1991), where the insurer conducted a selective review of the medical evidence and reached a conclusion that was unreasonable. *Quinn,* 161 F.3d at 477; *see DiPietro,* 2004 WL

626818 at *11.

In this case, MetLife's decision to deny White LTD benefits was patently unreasonable because it did not provide a full and fair review; therefore remand is unnecessary.[14] *See Quinn*, 161 F.3d at 477. MetLife conducted a careless and superficial review of White's claim during which it: 1) did not follow its own procedure; 2) consistently misstated White's job title during three critical points of the review; 3) did not describe the background or qualifications for the internal MetLife reviewers (the "nurse consultants"); 4) included the wrong applicants information within White's file; and 5) did not attach parts of the record until filing its response brief in this case. After a disorganized and imperfect review, MetLife arbitrarily concluded that White was able to perform her "own occupation" without considering what White's occupation required. *See Weaver*, 990 F.2d at 159 (finding that remand was unnecessary because the insurer abused its discretion).

Further, MetLife did not give Dr. Menotti, MetLife's "independent physician consultant", an opportunity to fully review White's claim; rather, it instructed the IPC not to contact White or her primary physician. Although Dr. Menotti concluded that there was not enough medical evidence from White's treating physician to conclude that she was disabled, MetLife failed to provide him with additional medical evidence when it received new medical files from White. The recommendation of MetLife's other IPC, Dr. Givens, is

---

[14] The receipt of social security benefits, however, does reduce White's measure of damages under the Policy.

flawed because the doctor did not examine White or talk to her treaters and he based his

opinion on faulty information provided to him by MetLife regarding her job title and the lack

of a job description. Because MetLife acted arbitrarily and capriciously, this Court has no

confidence that it would give White a full and fair review if the Court remanded the case

back to MetLife. *See Govindarajan.*, 932 F.2d at 637 (finding that selective review of

medical evidence and a conclusion based on that selectivity was arbitrary and capricious and

did not warrant remand). In addition, a remand would penalize White and benefit MetLife.

This case is before the Court on a trial on the papers. Therefore, this Court is required

to make findings of fact as well as conclusions of law. *Sullivan v. Bornemann,* 384 F.3d 372,

375 (7th Cir. 2004). Based upon the evidence in the record, there is ample evidence for this

Court to conclude that White was indeed disabled under the MetLife Plan. According to the

Plan:

> "Disable" or "Disability" means that, due to sickness, pregnancy or accidental
> injury, you are receiving Appropriate Care and Treatment from a Doctor on a
> continuing basis; and [that] during your Elimination Period and the next 36
> month period, you are unable to earn more that 80% of your Predisability
> Earnings...at your Own Occupation for any employer in your Local Economy.

Both of the treaters who examined White and inquired about her job requirements concluded

that she was unable to continue on in her "own occupation." R. 29-30 (Attending Physician

Statement signed by Dr. Milik); 19-20 (letter by Dr. Milik attached to White's first appeal);

229-37 (therapist Toni Blumenthal's report). Dr. Milik spoke with White about the

requirements of her job and opined that "obviously with her current medical condition and

continuing pain as well as her major depression, she would not be able to continue at her previous position." R.20. Toni Blumenthal indicated that he did not believe White could work as it was difficult for her to do any daily jobs. R. 230. The Court discounts the recommendations by MetLife's IPCs, Drs. Menotti and Givens, primarily because neither of those reviewing doctors examined White or spoke with her treating physicians, nor did they have any way of knowing White's true occupation, much less what it required of her on a daily basis. Nothing in the record controverts the conclusion that White could not continue to work at her "own occupation" as a Senior Communications Specialist at ALPA. This Court concludes that she was therefore disabled under the Met Life Plan.

Furthermore, the Social Security Administration determined that White was disabled on December 19, 2003. Because the Social Security determination was rendered after MetLife's final decision, it was not considered by the Court in regards to the merits of White's claim. *See Perlman*, 195 F.3d at 982 (limiting deferential judicial review under ERISA to the information submitted to a plan's administrator). However, although this Court did not consider the Social Security determination for the purposes of determining whether MetLife's decision was arbitrary and capricious, Social Security decisions are still relevant and instructive. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1046-47 (7th Cir. 2004); *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994). Thus, although determinations made by the Social Security Administration are not binding in ERISA actions, *see Anderson*, 991 F.2d at 358-59 (7th Cir.1993) (holding that Social

Security determinations of disability are not dispositive of disability under a pension plan), a determination of disability under the Social Security Act can be considered when applicable. *See Ladd*, 148 F.3d at 755-56 (considering the grant of social security benefits in an ERISA case as it related to defendant insurance company's actions).

It is true that the Social Security Administration and MetLife make their determinations based on different standards - the Social Security Administration determines whether a claimant is disabled from *any* occupation, whereas MetLife determines whether the claimant is disabled from his *own* occupation. *See* 20 C.F.R. § 416.920. However, an inability to perform one's own job is one of the five steps necessary to prove entitlement to Social Security benefits, *see id.*, thus the award of Social Security benefits by an impartial Administrative Law Judge is instructive. Only after the Administrative Law Judge has concluded that the claimant cannot perform her *own* occupation does he consider whether the claimant can perform *any* occupation. *Id.* It is likely more difficult for a claimant to prove that she is disabled from any occupation than to prove that she is disabled from her own. Although the social security determination of disability is not binding on this court, it corroborates the conclusion that plaintiff was disabled from performing her regular occupation. *See La Barge,* 2001 WL 109527 at *8 ("The findings of the Social Security Administration is compelling evidence of [the claimant's] disability.").

As it is clear to this Court that MetLife acted arbitrarily and capriciously in denying White's claim for LTD benefits, public policy warrants that White be immediately awarded

37

her past due benefits under the Plan. *Hackett*, 315 F.3d at 776 (awarding the reinstatement of benefits because the termination was arbitrary and capricious); *see also Halpin*, 962 F.2d at 697 (finding that the reinstatement of benefits was proper where significant procedural defects occurred in the plan administrator's review).

## E.     PLAINTIFF IS ENTITLED TO ATTORNEY'S FEES

Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).  In awarding attorney's fees to the prevailing party, the court asks whether the losing party's position was substantially justified and taken in good faith. *Wyatt v. Unum Life Ins. Co. of Am.*, 223 F.3d 543, 547 (7th Cir. 2000).  The Court finds that MetLife's position was not substantially justified and was not taken in good faith as itemized above. *See* Parts II.C-D.  Therefore, White is entitled to attorney's fees. *See Hess*, 274 F.3d at 464.

## IV. CONCLUSION

For the reasons set forth in this opinion, **the Court finds in favor of Plaintiff, Kathleen White, and against Defendant, Metropolitan Life Insurance Company, for all back payments due under the Plan, plus prejudgment interest and attorney's fees and court costs, once these amounts are computed.** MetLife shall continue making future payments to Plaintiff under the Plan until such time as it makes an adverse determination consistent with ERISA of her entitlement to LTD benefits under the Plan. The Court directs counsel to confer in order to assist the parties and the Court to reach an agreement as to the amount of past benefits, prejudgment interest, attorney's fees, and costs to be awarded consistent with this opinion. The status of the agreement as to the amount of the judgment shall be reported at 10:00 a.m. on April 26, 2005, and the parties shall submit a proposed final judgment order. The parties are encouraged to expedite the exchange of information regarding attorney's fees and costs under Local Rule 54.3. A final judgment will be entered once all of the computations have been agreed to or decided by this Court.

**SO ORDERED THIS 8th DAY OF APRIL, 2005.**

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**